**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| LINDEN KELLY, on behalf of himself and others similarly situated, | : <br> : <br> : <br> : Case No: 23-1301 |
| Plaintiff, | : <br> : |
| v. | : <br> : |
| TARGET CORPORATION, | : <br> : |
| Defendant. | : <br> : |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION AND BACKGROUND ................................................................. 1

        A.      The Philadelphia Fair Workweek Law ..................................................... 1

        B.      The City of Philadelphia Has Investigated And Found Target's Non-Compliance With One Aspect Of The Fair Workweek Law ...................................................... 4

        C.      Relevant Procedural History .................................................................... 4

II.     THIS CASE CONCERNS COMMON LEGAL QUESTIONS THAT CAN BE RESOLVED BY COMMON EVIDNENCE ................................................................. 5

        A.      Target's Fair Workweek Law Policies, Practices, and Documents (or Lack Thereof) Are Uniform and Common ...................................................... 6

        B.      Whether Target's Failure To Distribute To Team Members A Written Policy For Offering And Distributing Work Shifts, And Its Failure To Post Such Policy In Its Stores, Violates The Fair Workweek Law Can Be Determined By Common Proof. ........................................................................................... 8

        C.      Whether Target Provides Proposed Class Members With Compliant Notices of Available Work Can Be Determined By Common Proof ......................... 9

        D.      Whether Target Violated The Fair Workweek Law By Failing To Obtain And Document Written Consent From Employees Before Adding Time To Employees' Posted Schedules Can Be Determined By Common Proof ................................ 12

                1.      As A Matter Of Common Policy, Target Does Not Obtain Contemporaneous Written Consent To Added Work Time ..................... 13

                2.      Common Evidence Will Show That Target's Uniform "Philadelphia Schedule Edit Logs" Do Not Memorialize Written Consent Under the Fair Workweek Law ................................................................................. 15

                        a.      Target's Witnesses' Testimony Will Confirm That, As A Matter of Policy, The Schedule Edit Logs Do Not Constitute Contemporaneous Written Consent For Additional Hours .................................. 18

                        b.      Additionally, Whether On Their Face, The "Philadelphia Schedule Edit Logs" Fail To Constitute Written "Consent" From Employees Can Be Adjudicated Base On Common Evidence ................................. 22

        E.      Proposed Class Members' Damages Are Measurable ........................... 23

III.    THE COURT SHOULD GRANT CLASS CERTIFICATION ............................... 24

        A.      Class Certification Under Rule 23(b)(3) Is Warranted ......................... 24

                1.      Numerosity ................................................................................. 25

                2.      Commonality ............................................................................... 25

                3.      Typicality .................................................................................... 27

    4.    Adequacy ................................................................................ 28

    5.    Predominance ....................................................................... 28

    a.    The Rules Underlying The Predominance Analysis ................................. 29

    b.    The Predominance Requirement Is Satisfied Here ................................. 31

    6.    Superiority.............................................................................. 32

    7.    Ascertainability .................................................................... 33

B.    Plaintiff's Counsel Should Be Appointed As Class Counsel............................. 34

C.    The Court Should Approve The Enclosed Form Of Notice And Notice Protocol 34

IV.    CONCLUSION........................................................................................ 34

## TABLE OF AUTHORITIES

Page(s)

Cases

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ......................................................................................... 25, 29, 31
*Baby Neal v. Casey*,
  43 F.3d 48 (3d Cir. 1994) ....................................................................................... 25, 27
*Boley v. Universal Health Servs., Inc.*,
  36 F.4th 124 (3d Cir. 2022) ........................................................................................ 27
*Boley v. Universal Health Servs., Inc.*,
  337 F.R.D. 626 (E.D. Pa. 2021) ................................................................................. 25
*Davis v. Target Corp.*,
  No. CV 23-89, 2023 WL 8373162 (E.D. Pa. Dec. 1, 2023).............................Passim
*Goldman v. Radioshack Corp.*,
  No. 03 Civ. 0032, 2005 WL 1124172 (E.D. Pa. May 9, 2005) ............................... 31
*Hargrove v. Sleepy's LLC*,
  974 F.3d 467 (3d Cir. 2020) .................................................................................. 30, 33
*Hargrove v. Sleepy's LLC*,
  No. 22-2040, 2023 WL 3943738 (3d Cir. June 12, 2023)................................... 28, 30
*Hassine v. Jeffes*,
  846 F.2d 169 (3d Cir. 1988) ...................................................................................... 28
*In re Community Bank of N. Va Mortg. Lending Practices Litig.*,
  795 F.3d 380 (3d Cir. 2015) ...................................................................................... 25
*In re Prudential Insurance Co. Sales Practice Litig.*,
  148 F.3d 283 (3d Cir. 1998) ...................................................................................... 29
*In re Suboxone Antitrust Litig.*,
  967 F.3d 264 (3d Cir. 2020) ...................................................................................... 30
*Malone v. United States Parcel Service, Inc.*,
  No. 2:21-CV-03643-JDW, 2025 WL 3565108 (E.D. Pa. Dec. 12, 2025)................ 28
*NFL Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016) ...................................................................................... 25
*Portillo v. Nat'l Freight, Inc.*,
  336 F.R.D. 85 (D.N.J. 2020) ...................................................................................... 33
*Rivet v. Off. Depot, Inc.*,
  207 F. Supp. 3d 417 (D.N.J. 2016).............................................................................. 29
*Sadler v. Target Corp.*,
  No. CV 23-00030, 2025 WL 337698 (D.N.J. Jan. 29, 2025)............................... 30, 33
*Talarico v. Pub. P'ships, LLC*,
  No. CV 17-2165, 2022 WL 1524109  (E.D. Pa. May 12, 2022)............................... 26
*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ........................................................................................ 28, 29, 30
*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .............................................................................................. 24, 26

*Williams v. Jani-King of Philadelphia Inc.*,
  837 F.3d 314 (3d Cir. 2016) ........................................................................................Passim
*Williams v. Sweet Home Healthcare, LLC*,
  325 F.R.D. 113 (E.D. Pa. 2018) ............................................................................................ 26


**Rules**

Fed. R. Civ. P. 23 ......................................................................................................................Passim


**Statutes and Ordinances**

Chicago City Code §§ 6-110-010 to 6-110-170 .......................................................................... 2
Los Angeles, California (Ord. No. 187710) ................................................................................ 2
N.Y.C. Admin. Code § 20-1221(c)(1) ...................................................................................... 10
N.Y.C. Admin. Code §§ 20-1201 to 20-1275 ............................................................................. 1
Or. Rev. Stat. §§ 653.412 to 653.490 ......................................................................................... 2
Philadelphia Fair Workweek Employment Standards Ordinance, Phila. Code Chapter 9-4600, *et
  seq* ......................................................................................................................................Passim
San Francisco Police Code Art. 33F and 33G ........................................................................... 2


**Other Authorities**

Economic Policy Institute, *"Fair workweek" laws help more than 1.8 million workers: Laws
  promote workplace flexibility and protect against unfair scheduling practices* (July 19, 2018) 2
Economic Policy Institute, *Irregular Work Scheduling and Its Consequences* (Apr. 9, 2015),
  *available at* https://files.epi.org/pdf/82524.pdf (last accessed December 11, 2025) . . ………..2
NYC Consumer and Worker Protection, *Mayor Adams, DCWP Announce $38 Million Settlement
  With Starbucks in Largest Worker Protection Settlement in City History* (Dec. 1, 2025)……2
Philadelphia City Council, *Councilmember Helen Gym Introduces Fair Workweek Legislation
  With Support of Seven Councilmembers and Growing Coalition*, June 14, 2018...................... 1

## I.    INTRODUCTION AND BACKGROUND

Plaintiff Linden Kelly ("Plaintiff") seeks to certify a class to challenge Defendant Target Corporation's ("Target" or "Defendant") failure to fully comply with the Philadelphia Fair Workweek Employment Standards Ordinance, Phila. Code Chapter 9-4600, *et seq.* ("Fair Workweek Law").

Plaintiff seeks certification of the following class: all current and former hourly-paid Team Member employees who work or worked at a Target store in Philadelphia in any workweek from February 17, 2021, through the date of class certification.

### A. The Philadelphia Fair Workweek Law

Philadelphia enacted the Fair Workweek Law to ensure greater stability and pathways to full-time employment for hourly workers in Philadelphia who work for larger employers in the retail, food, or hospitality services industries.  Like several other state and local governments, Philadelphia recognized that many lower wage workers do not have a regular work schedule and cannot predict their monthly income because their schedules change so much, and that they also lack pathways to more full time employment.[1]  This instability and lack of access to hours places

---

[1]    Philadelphia City Council, *Councilmember Helen Gym Introduces Fair Workweek Legislation With Support of Seven Councilmembers and Growing Coalition*, June 14, 2018 *available at* https://phlcouncil.com/councilmember-helen-gym-introduces-fair-workweek-legislation-with-support-of-seven-councilmembers-and-growing-coalition/.  This press release quotes a Target employee:

> "The companies we work for say that all the employees in these stores are students. The truth is that most of us are parents raising our kids. We're trying to provide for our kids. Some of us are veterans or are older people in their 70s trying to make ends meet. We're not just students looking for extra cash; we're trying to earn an income to support our families—including me," said David Smith, One Pennsylvania member and Target employee.

*Id.*

Notably, numerous other jurisdictions have implemented predictive scheduling laws similar to the Philadelphia Fair Workweek Law, including New York, New York ((N.Y.C. Admin.

1

undue strains on workers and their families – for example, absent a predictable schedule employees cannot adequately plan for childcare, and without predictable income or opportunities for more work hours or full time employment, employees similarly face economic and other barriers when caring for themselves and their families.[2]

The Fair Workweek Law applies only to certain large businesses in the retail, hospitality, or food services industries that have 250 or more employees and have 30 or more locations worldwide, *see* Phila. Code § 9-4601(4).  The Law seeks to ensure that employees of those businesses have, *inter alia*, scheduling predictability and access to work hours.  To this end, and relevant to this matter, the Fair Workweek Law requires that covered employers provide their employees with advance notice of their schedules and advance notice of shift changes, *see* § 9-4602; that employers obtain employees' written consent before adding hours to employees' schedules after employee schedules have been posted, *see* § 9-4602(6); that in certain enumerated instances, employers pay employees "Predictability Pay" when employers make changes to employees' schedules after they are posted, *see* § 9-4603; that employers provide written notice of available work shifts for at least 72 hours before hiring new employees and do so electronically if

---

Code §§ 20-1201 to 20-1275); San Francisco, California (San Francisco Police Code Articles 33F and 33G); Los Angeles, California (Ord. No. 187710); Chicago, Illinois (Chicago City Code §§ 6-110-010 to 6-110-170); and Oregon ((Or. Rev. Stat. §§ 653.412 to 653.490).

[2]       Indeed, "[t]here is growing recognition that unpredictable, unstable, and often insufficient work hours are a key problem facing many U.S. workers, particularly those in low-wage industries" and ""[v]olatile hours not only mean volatile incomes, but add to the strain working families face as they try to plan ahead for child care or juggle schedules in order to take classes, hold down a second job, or pursue other career opportunities."  Economic Policy Institute, *"Fair workweek" laws help more than 1.8 million workers: Laws promote workplace flexibility and protect against unfair scheduling practices* (July 19, 2018), available at https://files.epi.org/pdf/145586.pdf (last accessed December 11, 2025).  *See also* Economic Policy Institute, *Irregular Work Scheduling and Its Consequences* (Apr. 9, 2015), *available at* https://files.epi.org/pdf/82524.pdf (last accessed December 11, 2025).

they customarily communicate with employees electronically, *see* § 9-4605; and that employers have a policy for offering and distributing work shifts to existing employees before hiring new employees, and that employers communicate this policy in writing to employees and post this policy at the workplace, *see* § 9-4605(6). Employers were required to be compliant with the Fair Workweek Law by April 1, 2020. Here, Target does not dispute that it is required to comply with the Fair Workweek Law.[3]

This case is about Target's failure to fully comply with the requirements of the Fair Workweek Law, and it is quintessentially amenable to class treatment. Notably, several courts have granted class certification to settlement classes alleging similar class-wide violations of the Philadelphia Fair Workweek Law (and have granted settlement approval).[4] And recently, the City of New York evaluated Starbucks' violations of New York's version of the Fair Workweek Law on a city-wide basis, entering into a consent decree with Starbucks that resolved the claims of all New York City Starbucks workers during the time period at issue.[5] As discussed throughout, the Court should find that class treatment is warranted here.

---

[3]    Target admits it is "a covered employer for the purposes" of the Fair Workweek Law and that Plaintiff is a "covered employee for the purposes" of the Fair Workweek Law. ECF No. 3 (Def.'s Ans.) ¶¶ 9, 12.

[4]    *Washington v. Walmart*, No. 22-3429, ECF No. 44 (E.D. Pa. March 26, 2025) (granting final approval); *Bermudez v. Home Depot U.S.A. Inc.*, Case No. 24033407 (Phila. Cty. Com. Pl. Aug. 15, 2024) (granting final approval); *Schmitt-Hall v. The GIANT Company*, Case No. 220900784 (Phila. Cty. Com. Pl. Jan. 25, 2024) (granting final approval); *Kelley v. Curaleaf, Inc.*, Case No. 221002070 (Phila. Cty. Com. Pl. October 1, 2024) (granting final approval); *Spady v. Ross Stores, Inc.*, No. 23 Civ. 3010, ECF No. 46 (E.D. Pa. Sept. 30, 2024) (granting final approval); *Temple v. Wawa, Inc.*, Case No. 24056697 (Phila. Cty. Com. Pl. Aug. 15, 2024) (granting final approval) *Lang v. Hersha Hospitality Management, LP d/b/a Hilton Homewood Suites*, Case No. 24074024 (Phila. Cty. Com. Pl. Nov. 19, 2024) (granting final approval).

[5]    *See* NYC Consumer and Worker Protection, *Mayor Adams, DCWP Announce $38 Million Settlement With Starbucks in Largest Worker Protection Settlement in City History* (Dec. 1, 2025), *available at* https://www.nyc.gov/site/dca/news/032-25/mayor-adams-dcwp-38-million-settlement-starbucks-largest-worker-protection (last accessed Dec. 11, 2025).

### B.  The City of Philadelphia Has Investigated And Found Target's Non-Compliance With One Aspect Of The Fair Workweek Law

By way of background, it bears noting that the City of Philadelphia previously investigated a limited aspect of Target's non-compliance with the Fair Workweek Law. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████

### C.  Relevant Procedural History

Plaintiff Linden Kelly brings this case against Target on behalf of himself and a proposed class of hourly Team Members at Philadelphia Target locations, alleging Target's class-wide non-compliance with several aspects of the Fair Workweek Law.  Plaintiff was employed by Target as an hourly employee at the Target store located at 1 Mifflin St, Philadelphia, PA 19148, and worked there from approximately November 2015 to December 2022.  *See* ECF No. 3 (Def.'s Answer) at ¶¶ 10, 11. Plaintiff filed this case on February 16, 2023, in the Philadelphia Court of Common Pleas, and Target removed this matter to this Court on April 4, 2023.  ECF No. 1.  The Parties

engaged in pre-certification factual discovery, and Plaintiff now moves to certify a class on behalf of himself and other Philadelphia Target hourly employees.

As discussed herein, in this case, Plaintiff challenges the legality of Target's common documents, policies, and practices with respect to the Fair Workweek Law, which Plaintiff will point to when seeking to demonstrate, on a class-wide basis at the merits phase, that Target is liable for not fully complying with the Law.  For example, (1) Target's common policy and practice of not notifying Team Members by written communication of its policy for offering and distributing work shifts and not posting such a policy in the workplace violates the Fair Workweek Law; (2) Target's common policy and practice of failing to provide (including through electronic means) compliant notices of available shifts to existing employees before hiring new employees violates the Fair Workweek Law; and (3) Target's failure to obtain and document contemporaneous written consent from employees when Target adds time to employees' posted schedules likewise violates the Fair Workweek Law. These allegations can be assessed on a class-wide basis.

This case is quintessentially suited for class treatment, and the requirements of Rule 23(a) and (b) are met.  Class treatment is warranted.

## II.    THIS CASE CONCERNS COMMON LEGAL QUESTIONS THAT CAN BE RESOLVED BY COMMON EVIDNENCE

Plaintiff's claims in this case concern common, predominating, class-wide legal questions of Target's non-compliance with several aspects of the Fair Workweek Law.  Whether Target violated the Law can be resolved by common evidence and common legal arguments applicable to all class members, rendering this case aptly amenable to class treatment.  In the Sections below, Plaintiff provides an overview of Target's violations of the Fair Workweek Law.  In doing so, Plaintiff demonstrates that common evidence (namely, Target's uniform documents and policies,

or lack thereof) can be used to resolve the common, predominating questions regarding whether Target violated the Law.  Later, at the merits stage, Target's liability will be determined.  *See, e.g., Williams v. Jani-King of Philadelphia Inc.,* 837 F.3d 314, 322 (3d Cir. 2016) (affirming Judge Surrick granting class certification in employee misclassification case, and rejecting Defendant's invitation for the court to *"*weigh in on the merits of the Plaintiffs' claim now" and finding that to affirm a grant of class certification, "[i]t is enough for us to determine that some franchise agreements may contain sufficient controls to render the relationship one of employment *and that the common documents in this case contain the types of evidence that courts and juries use to make that determination under Pennsylvania law*." (emphasis added)).

## A. Target's Fair Workweek Law Policies, Practices, and Documents (or Lack Thereof) Are Uniform and Common

Target has a centralized, corporate-level Human Resources team that develops and disseminates standardized documents and policies related to the Fair Workweek Law to Target stores in Philadelphia. Target's corporate-level Director of Employee Relations testified that he, along with an HR policy team, helped build Target's Fair Workweek Law policies after the Fair Workweek Law went into effect, and that he works with Target's corporate-level HR policy team regarding Target's policies with respect to the Fair Workweek Law.[6]  Each of the Philadelphia stores at issue are part of a top-down reporting structure[7], and Target's Fair Workweek Law

---

[6]     Exhibit 2, Brewer Tr. 15:20-22 (Mr. Brewer helped build Target's Fair Workweek Law policies), 20:16-21:23 (Mr. Brewer met with district leaders after the Fair Workweek Law became law); 22:2-13 (Mr. Brewer testified that "if there's a question of legality or an interpretation of what the Fair Workweek says versus what our policy says, that's where I would work with our HR policy team to ensure that our policies are compliant"); 138:05-140:16 (Mr. Brewer describing Target's "HR Policy team" that builds out Target's Fair Workweek policies and that he "was part of working with the team that creates [Target's policies]").

[7]     All of the stores at issue are within the same "Region" at Target (Region 400) and Region 400 has a Senior Vice President and Human Resources Vice President. Exhibit 16, Brewer

policies and practices are disseminated down from the top at Target's corporate level.[8] Target

maintains written, standardized Fair Workweek Law documents and policies to ensure uniformity

across its Philadelphia stores,[9] including the standardized documents and policies (or lack thereof)

that are at issue here – namely, Target's uniform Notices of Available Work and Schedule Edit

Log documents, as well as Target's common lack of a policy that it distributes to employees and

posts in its workplace regarding the offering of work shifts to existing employees before it hires

new employees and Target's lack of a policy for obtaining contemporaneous written consent from

employees prior to adding time to their posted schedules.[10] Target's Human Resources leadership

---

Declaration at ¶¶ 3-5, 12. Region 400 is broken into seven "Groups." *Id.* at ¶¶ 3-5. All of the Philadelphia stores at issue are in the same "Group" (Group 493) and are within the purview of a Vice President for Group 493 as well as an HR Director for Group 493. *Id.* ¶¶ 5, 13. Group 493 is broken into seven "Districts," and the Philadelphia stores have been within three of those Districts since the start of this case (Districts 401, 421, and 462). *Id.* ¶¶ 6-10. The three relevant Districts each have Senior District Directors as well as Human Resources Business Partners. *Id.* ¶¶ 8-16. The Philadelphia stores have Store Directors as well as Executive Team Leaders, including "Human Resources Executive Team Leaders" who are supported by their respective Human Resources Business Partners. Exhibit 5, Gladman Tr. 12:23-13:10; Exhibit 2, Brewer Tr. 116:14-20 (explaining "so we have team members and team leaders. Those are our non-exempt roles in stores. TL is team leader; ETL is an exempt leader, and so it means executive team leader; and SD would be the equivalent of our store manager, so that's store director").

Ms. Erica Gladman, the Human Resources Business Partner for District 401, described that her role as a Target Human Resources Business Partner is to "support the nine stores that are a part of District 401 when it comes to human resources. Each of those stores has a human resources executive team leader and I am here as a support and field partner for the stores essentially." Exhibit 5, Gladman Tr. 12:23-13:10. Ms. Gladman reports to the HR Director for Group 493 who in turn reports to the Human Resources Vice President. *Id.* 62:14-63:19 (describing reporting structure).

[8]    *See supra* n. 7; *see also* Exhibit 6, Gonzalez Tr. 15:15-18:22, 47:12-49:11, 65:13-69:21 (Mr. Gonzalez, who has worked and provides coverage as a Target Executive Team Lead for HR in multiple Philadelphia Target stores, testified that Target's Fair Workweek Law policies "cascade[] down from the top, basically"). *See also, e.g.,* Exhibit 7, Nortey Tr. 38:13-41:17, 74:09-76:25 (an Executive Team Lead who has worked at two Philadelphia stores, identifying corporate training and policy documents that Target's corporate level provides to HR Leaders at Target stores through Target's internal system for training HR Leaders called Workbench).

[9]    Exhibit 5, Gladman Tr. 15:04-16:14.

[10]    *See infra* Sections II(B)-(D).

and "HR Policy Team" monitors the Philadelphia stores' execution of the Fair Workweek Law policies and procedures that Target has developed.[11]

While Target has made class-wide efforts to comply with the Fair Workweek Law, at all times – both before and following the City of Philadelphia's limited investigation and determination – these common efforts nevertheless fail to fully comply with the Fair Workweek Law. And here, Target's common documents and policies (or common lack thereof) will be used to demonstrate Target's lack of full compliance, making this case aptly suited for class treatment.

**B. Whether Target's Failure To Distribute To Team Members A Written Policy For Offering And Distributing Work Shifts, And Its Failure To Post Such Policy In Its Stores, Violates The Fair Workweek Law Can Be Determined By Common Proof**

The Fair Workweek Law requires that employers let employees know – by "written communication" – what its policy is for offering and distributing work shifts to existing employees before it hires new employees. FWW § 9-4605(6). Employers are required to notify employees of its policy at the time that they are hired and within 24 hours of any chance in the policy. *Id.* Employers are also required to post the policy in an accessible location in the workplace.[12] In this

---

[11]    Exhibit 2, Brewer Tr. 138:03-140:16 (describing Target's monitoring of its Fair Workweek Law policies by "district leaders" and a the "HR Policy team"); Exhibit 5, Gladman Tr. 16:11-18:19 (as Human Resources Business Partner, every two months Ms. Gladman conducts audits of stores for compliance with Target's Fair Workweek Law policies and procedures utilizing a "Philadelphia Fair Workweek Audit Guide" that is provided to HR Business Partners).

[12]    The FWW provides:
An employer must notify an employee by written communication of its policy for offering and distributing work shifts under this Section, at the time of hire and within 24 hours of any change in the policy, and must post the notice in an accessible location in the workplace. The notice shall state:
   (a)  Where employees can access written notices of available work shifts;
   (b)  The process by which employees may notify the employer of their desire to work the available work shifts;
   (c)  The criteria for distribution of work shifts among qualified and interested employees.
FWW § 9-4605(6).

case, common evidence will show that Target does not comply with these requirements of the Fair Workweek Law.

Here, Target admits that it does not distribute to Team Members a written policy for offering and distributing work shifts.  Target admits that the "Scheduling Policy – Philadelphia" document produced in this case is an "educational document for HR" – *not* Team Members.[13] Target's failure to distribute to a written policy to Team Members is a uniform practice common to all class members, and Plaintiff contends that this uniform practice violates the Fair Workweek Law. Whether Target violated the Fair Workweek Law with respect to its failure to distribute such a written policy can be determined by common evidence:  primarily, the common absence of a policy that Target distributes to Team Member employees at the time of hire and upon any policy change.

Similarly, Target admits that it does not post in the workplace its policy for offering and distributing work shifts. In terms of Fair Workweek Law postings, Target posts only the Fair Workweek Law poster from the City of Philadelphia – *not* its policy for offering and distributing work shifts.  *See* Exhibit 16 (Brewer Decl. ¶22).

This claim is quintessentially appropriate for class treatment: the lack of such a distributed and posted written policy will be fatal to Target as to all proposed class members.

### C. Whether Target Provides Proposed Class Members With Compliant Notices of Available Work Can Be Determined By Common Proof

The Fair Workweek Law requires Target to post and electronically disseminate Notices of available shifts before hiring new employees. Plaintiff will point to common evidence when

---

[13]    *See* Exhibit 3, Brewer Tr. Designated as Rule 30(b)(6) Testimony, 121:10-123:08; *see also* Exhibit 16, Brewer Declaration at ¶ 26.

seeking to show that Target's uniform policy and practice is to only post paper Notices and not to provide such Notices electronically. Further, Plaintiff will seek to show that the uniform form paper Notices that Target posts do not provide all required information.

Specifically, the Philadelphia Fair Workweek Law requires employers to "provide written notice of available work shifts for at least 72 hours, unless a shorter period is necessary in order for the work to be timely performed." § 9-4605(2). The notice must be "posted in a conspicuous location at the workplace that is readily accessible and visible to all employees. *The notice shall also be provided electronically* to each employee if the Covered Employer customarily communicates scheduling information in such manner with employees." *Id.* (emphasis added). In the New York City Starbucks Consent Order, one of the claims that Starbucks settled under New York City's Fair Workweek Law was that Starbucks "did not electronically transmit shift notices." Exhibit 14 (Starbucks Consent Order) § 3(c).[14]

Under the Philadelphia Fair Workweek Law, the Notice of Available Work must contain the following information:

- Available work Shifts or days and times they must be available to work;
- Length of time the Employer anticipates requiring coverage of the additional hours;
- Description of the position;
- Required qualifications for the position;
- The process by which Employees may notify the Employer of their desire to work the

---

[14]    *Compare* N.Y.C. Admin. Code § 20-1221(c)(1) (employer must provide employees with written notice of the work schedule as required by subdivision b of this section by (i) posting the schedule in a conspicuous place at the workplace that is readily accessible and visible to all employees and (ii) *transmitting the work schedule to each fast food employee, including by electronic means, if such means are regularly used to communicate scheduling information*") (emphasis added) *with* Philadelphia Fair Workweek Law § 9-4605(1) & (2)(a) ("Before hiring new employees from an external applicant pool or subcontractors, . . . [an employer] shall offer work shifts to existing employees. . . . *The notice shall also be provided electronically to each employee if the Covered Employer customarily communicates scheduling information in such manner with employees.*") (emphasis added).

offered hours; and

- If the notice is being posted for less than 72 hours pursuant to Rule 8.2, the notice shall contain that information.

*Id.*; Phila. Fair Workweek Reg. 8.4.

Here, Plaintiff can use common evidence to show that Target customarily communicates scheduling information electronically.[15] Thus, Plaintiff will contend that under the Fair Workweek Law, Target must distribute notices of available work electronically. *See* § 9-4605(2). Plaintiff can also use common evidence to show that Target has developed a standardized Notice of Available Work from that it utilizes in its Philadelphia stores; however, Target does not distribute these Notices electronically and instead only posts them on a physical board in each of the Philadelphia Target stores.[16] Thus, using common evidence, Plaintiff can demonstrate that as a matter of common policy applicable to all class members, Target does not provide notices of available work electronically, which Plaintiff contends violates the Fair Workweek Law.

Moreover, Plaintiff can use common evidence to show that Target's standardized "Philadelphia Offer of Work Notice" form itself is non-compliant. For example, Target's template Notice does not actually provide descriptions of the available positions, and instead directs

---

[15]    *See* Exhibit 13, Supplemental Answer to Request for Admission (". . .Target admits that it uploads the work schedules of the Putative Class Members to the myTime application and that the myTime application is made available to all Putative Class Members."). *See also* Exhibit 2, Brewer Tr. 30:3-32:07 (describing communicating schedules electronically to employees through myTime); Exhibit 5, Gladman Tr. 28:11-29:07 (describing Team Members seeing their weekly schedules on their phones); Exhibit 9, Kelly Tr. 37:13-38:06 (describing receiving schedule electronically and it being posted).

[16]    Exhibit 15, Examples of Philadelphia Offer of Work Notices ███████████████████ ████████████████████████████████████████████████████████████████████████████████ ███████████ Exhibit 5, Gladman Tr. 108:13-110:17 (confirming process with respect to Philadelphia Offer of Work Notice forms, which are used in all Philadelphia stores, and which involves posting on physical Great Place to Work Board and does not include electronic distribution), 111:10-16 (confirming that notices are not distributed electronically); Exhibit 2, Brewer Tr. 126:14-20 (Philadelphia Offer of Work Notices are "only done through paper").

proposed class members to take the additional steps of searching on "Workbench" (and here, as because the Notices are not electronically provided, Target cannot argue that they electronically link to or incorporate the job description).[17]

In sum, during the merits phase of this case, whether Target's documents and policies with respect to Notices of Available Work violate the Fair Workweek Law will be resolved on common evidence and this claim is aptly amenable to class treatment.

### D. Whether Target Violated The Fair Workweek Law By Failing To Obtain And Document Written Consent From Employees Before Adding Time To Employees' Posted Schedules Can Be Determined By Common Proof

Under the Fair Workweek Law, *before* an employer adds hours to an employee's already-posted schedule, the employer must obtain the employee's written consent to work those additional hours, and it must keep a record of the employee's written consent. Plaintiff contends that common evidence will demonstrate that Target does not have a policy and practice to contemporaneously obtain and record written consent from employees before adding time to their posted schedules. This violation is common to all class members.

Specifically, the Fair Workweek Law provides that if, after an employee's schedule is posted, an employer wants to add a shift or add more than 20 minutes of work that is not in the posted schedule, the employee must be able to "decline" to work those additional hours. § 9-4602(6). If the employee "consents" to work those added hours, the Law requires that the employer contemporaneously obtain and document such consent, which must be recorded by written communication. *Id.*[18] The employer is required to keep records of such "written consent

---

17    *See* Exhibit 15, Examples of Philadelphia Offer of Work Notices.
18    The Law states: "An employee may decline to work any hours or additional shifts not included in the Posted Work Schedule. If the employee voluntarily consents to work such hours, such consent must be recorded by written communication . . ." § 9-4602(6).

for work shifts." § 9-4609.  An employer's failure to obtain written consent is a violation of the Fair Workweek Law, *see* § 9-4602(6); Phila. Fair Workweek Reg.10.0(d).

Here, Plaintiff will point to common evidence to show that Target does not obtain and record written consent from employees prior to adding time to their work shifts, in violation of the Fair Workweek Law.

### 1. As A Matter Of Common Policy, Target Does Not Obtain Employees' Contemporaneous Written Consent To Added Work Time

As explained *supra* Section II(A), Target has common, class-wide Fair Workweek Law policies, procedures, and documents.  Relevant here, those common policies do not reflect a requirement that Target contemporaneously obtain written consent from employees prior to adding time to employees' schedules after they have been posted.  Indeed, none of the policies that Target produced in this case reflect such a requirement.

Notably, the City of Philadelphia makes available a model "Consent to Schedule Change" template, which is available on the City's website and is attached hereto as Exhibit 12.[19]  This template is a common source of evidence and argument, and it: (1) reiterates the Fair Workweek Law's requirement that the employer obtain consent prior to the schedule change –"employers must obtain employee consent *in order to make* the following changes" (emphasis added); (2) documents whether the schedule change was requested by the employer or employee; (3) memorializes the date that consent was provided; and (4) memorializes the date on which they schedule change *will* occur.  The model template is below:

**Consent to Schedule Change**

**Fair Workweek Requirements:**

Under Chapter 9-4600 of the "Philadelphia Code" the Fair Workweek Employment Standards, employers must obtain employee consent in order to make the following schedule changes:
● Add hours to the posted work schedule
● Schedule a shift that falls under the 9 hours of rest requirement defined in the law

This form can be used in order to demonstrate compliance with changes to the Advance Notice of Work Schedule and the 9 hours of rest requirement. Employers may not retaliate against employees for exercising their rights under this law.

**Nature of Change:**

☐ Employer requested change          ☐ Employee requested change

**Date of Consent:**                  **Date of Change:**

_____              _____

**Type of Schedule Change:**

☐ Add time to work shift                    ☐ Leave early or lateness (<20min)
☐ Subtract time to work shift or cancel shift ☐ Shift swap or add shift
☐ Change date, time or location of work shift ☐ Other_____

**Compensation for employer requested change:**

| Change made: | Predictability Pay: |
|---|---|
| Employer adds time to work shift, with no loss of hours | One hour at Employee's rate of pay |
| Employer changes the date of a work shift | One hour at Employee's rate of pay |
| Employer changes the location of a work shift | One hour at Employee's rate of pay |
| Employer subtracts hours from a regular OR On-Call Shift | No less than one-half hours Employee's rate of pay per hour, for any scheduled hours the Employee does not work |
| Employer cancels a regular OR On-Call Shift including not calling in to work an On Call Shift. | No less than one-half times employee's rate of pay per hour, for any scheduled hours the employee does not work |

**Employee Signature and Date:**       **Supervisor Signature and Date:**

_____              _____

**Employers must keep record of this notice for two years.**

**Mayor's Office of Labor** CITY OF PHILADELPHIA   The Office of Benefits and Wage Compliance  ●  Model Template for Fair Workweek
For more information, contact our office at Fairworkweek@phila.gov or call 215.686.0802

Plaintiff will show that, as a matter of common policy, Target does not utilize this model template or any analogous written communication to obtain and record all information contemplated by it, nor does Target otherwise obtain "written consent" from employees when it seeks to add time to employees' schedules, as required by the Fair Workweek Law.[20]

As stated, Target's common Fair Workweek Law policies do not require that employees' written consent be obtained and recorded prior to employees working the additional time, nor do any documents demonstrate that Team Members are provided an opportunity to decline additional

---

[20]    Exhibit 5, Gladman Tr. 91:19-92:9 (Human Resources Business Partner testified that she has never seen the Philadelphia template).

14

hours, and Target has produced no such documentation in this case.  This is fatal to Target as to all class members' claims.

Plaintiff anticipates that Target will point to its common "Philadelphia Schedule Edit Logs" as purported evidence of written consent from employees, but, as explained below, common evidence will likewise show that Target's "Philadelphia Schedule Edit Logs" do not constitute "written consent" under the Fair Workweek Law.  And, even if it did, this uniform document was used at all Philadelphia Target Stores and, thus, the merits issue of whether it constitutes consent can be adjudicated on a class-wide basis. This claim is aptly suitable to class treatment.

### 2. Common Evidence Will Show That Target's Uniform "Philadelphia Schedule Edit Logs" Do Not Memorialize Written Consent Under the Fair Workweek Law

Target has created a uniform form for its Philadelphia stores that it calls a "Philadelphia Schedule Edit Log," examples of which are attached as Exhibits 10 and 11, and are depicted below. Target's Philadelphia Schedule Edit Logs are intended to document schedule changes.[21]  The Logs are the only documentation on which Target has gathered signatures (initials) from proposed class members regarding additional hours that are not shift swaps.[22]

In this litigation, Target has produced two versions of its standardized Philadelphia Schedule Edit Log form.  One version, an example of which is depicted below and examples attached as Exhibit 10, was used prior to and in the few months following the City's investigation and Notice of Determination in April 2021.

---

[21]     Exhibit 5, Gladman Tr. 47:23-49:08 (describing Schedule Edit Log); Exhibit 6, Gonzalez Tr. 53:08-12 ("The Schedule Edit Log is basically just a log to show if there was an edit to someone's schedule").

[22]     Exhibit 5, Gladman Tr. 60:12-61:11 (schedule edit logs only place that Team Members sign), 32:9-19 (all schedule changes for hourly team members are captured on the Philadelphia Schedule Edit Log).



It bears noting that, for the time period prior to May 2021 and when the above prior version of the Schedule Edit Log was in effect, Target has produced no evidence of having paid Predictability Pay when employees' schedules changed after being posted.

The second version of Target's Philadelphia Schedule Edit Logs, an example of which is depicted below and examples attached at Exhibit 11, was implemented in or around mid-2021.[23]

---

23



16



Target's Philadelphia Schedule Edit Log forms are utilized in all Philadelphia Target stores where proposed class members work.[24] Target maintains its Schedule Edit Logs at the HR desks in the Team Member Service Areas in the Target stores.[25]  The Logs are kept in binders for each month and in the possession of the HR team at the stores.[26]

---

[24]    Exhibit 2, Brewer Tr. 113:04-115:21 (explaining Schedule Edit Log and that "every store would have this for every week").
[25]    Exhibit 5, Gladman Tr. 48:10-49:08 (Schedule Edit Logs are kept in Team Member Service Area, and are kept in binders and in HR team's possession); Exhibit 8, Brotnitsky Tr. 65:12-22 (Schedule Edit Logs kept at the Team Service Center where the HR desks are).
[26]     Exhibit 5, Gladman Tr. 48:10-49:08 (Schedule Edit Logs are kept in Team Member Service Area, and are kept in binders and in HR team's possession).

It is Target's uniform policy to record all schedule changes on the Philadelphia Schedule Edit Logs.[27]  Target's HR team or Team Leaders record schedule changes in the Logs.[28]  Target's HR team also inputs schedule changes onto the Logs from Target's electronic myTime system.[29]

Plaintiff anticipates that Target will point to the column on the Logs titled "TM Acknowledgement of Voluntary Change" when attempting to demonstrate that it obtains written consent from employees for additional time.  Target's argument will fail as to all class members, but regardless, can be adjudicated on a class-wide basis.  The common question of whether Target fails to obtain written consent for additional hours and whether the uniform Schedule Edit Log form constitutes "written consent" renders this case appropriate for class certification as the determination to the merits question will be resolved based on common evidence.

### a. Target's Witnesses' Testimony Will Confirm That, As A Matter of Policy, The Schedule Edit Logs Do Not Constitute Contemporaneous Written Consent For Additional Hours

Relying on common evidence, at the merits stage, Plaintiff will show that Target did not obtain written consent for additional hours from Team Members, and that Target's Philadelphia Schedule Edit Logs do not constitute such written consent.  Indeed, consistent with Target's lack of a policy in this regard discussed *supra,* Target's witness' testimony will further confirm that the

---

[27]    Exhibit 5, Gladman Tr. 60:12-61:11 (schedule edit logs only place that Team Members sign), 32:9-19 (all schedule changes for hourly team members are captured on the Philadelphia Schedule Edit Log); Exhibit 8, Brotnitksy Tr. 63:22-64:7 (explaining that a Schedule Edit Log is "the physical place where we write down any- anything – any different- any differences in what a Team Member's schedule is versus what they actually worked . . .").

[28]    Exhibit 8, Brotnitsky Tr. 73:13-23 (if a Team Leader wants to change a Team Member's schedule, the Team Leader will write it or will tell a member of the HR team); Exhibit 5 Gladman 53:22-58:05 (describing that the Log is filled out by the Team Leader or the HR team).

[29]    Exhibit 5, Gladman Tr. 32:9-19 (explaining that once HR reviews the electronic MyTime, then they add any changes to the edit log).

purpose of the Schedule Edit Logs is an HR tool to record schedule modifications – it does not memorialize "written consent" as contemplated by § 9-4602(6).

Here, testimony confirms that Target's policy is to utilize the Schedule Edit Logs to *record* attendance that differed from the posted schedules – *not* to provide Team Members with the opportunity to decline or provide written consent for additional work hours.[30] Further, Target's witnesses also describe the "Acknowledgement" column of Schedule Edit Logs being used to memorialize *employee-initiated* schedule changes that provide Predictability Pay exclusions for Target, pursuant to § 9-4603(2)(a).[31] In fact, Target's witnesses did not describe the Schedule Edit

---

[30]    Exhibit 5, Gladman Tr. 47:23-48:9 (testifying that the Schedule Edit Log is used to document changes and determine if Predictability Pay is owed based on the changes); Exhibit 6, Gonzalez Tr. 53:8-12 ("The Schedule Edit Log is basically just a log to show if there was an edit to someone's schedule."), 78:20-24 (identifying the reason for Team Members to initial the Schedule Edit Log is to that "Team Member knows these things are happening" and not testifying to consent); Exhibit 8, Brotnitsky Tr. 47:9-18 (testifying that one of her job duties is to compare attendance with the posted schedule and ensure all modifications are recorded in the Schedule Edit Log); 53:20-57:8 (testifying district-wide audits of the Schedule Edit Logs entail examining "a couple Team Members' time cards" and making sure the electronic time records on Mytime match the Schedule Edit Logs); 64:2-6 (describing the Schedule Edit Logs as "the physical place where we write down . . . any differences in what a Team Member's schedule is versus what they actually worked."); 65:23-70:13 (testifying, Target human resources fills the Schedule Edit Log out by reviewing Team Members electronic time records and recording on the Schedule Edit Log any discrepancies from the posted schedule, often doing this on the *following work day*, and that managers also record changes in the Schedule Edit Log, but human resources "put in the majority of the [] codes."); 72:2-10 (testifying she has to ask managers after schedule changes occurred why they occurred because the changes were not contemporaneously recorded on the Schedule Edit Log).
[31]    Exhibit 4, Carroll Tr. 69:16-20 (testifying that the "Acknowledgement of Voluntary Change (TM Initial)" was obtained when "The team member made the change. It wasn't the leader."). Exhibit 8, Brotnitsky Tr. 89:03-90:23 ("back in 2022 we only had to -- we were only getting the signatures for voluntary changes that the Team Member did, so now we get – for every -- we have them sign for everything, but in the past it was only if the Team Member was picking it -- picking -- making the change themselves because they don't get the extra hour for a voluntary change, so that's why we -- they would have to acknowledge that" and "as of a year ago" the District Manager directed store HR leadership to "get signatures for everything"); 91:6-92:6 (testifying that she understood "voluntary" in the "Acknowledgement of Voluntary Change (TM Initial)" column to mean *employee initiated*); 101:23-102:7 (testifying Predictability Pay not owed

19

Logs as consent forms or represent that Target has a policy or process of obtaining consent from Team Members before assigning them additional hours.[32]

Target's witnesses also describe a process through which the Schedule Edit Logs are completed *after* the schedule change, and even *after* the additional time is worked. At Target, additional hours are assigned by Team Members' managers.[33] Only after this occurs do the managers go to the Human Resources area and log the change in the Schedule Edit Log.[34] Sometimes, changes are not logged at all by the store managers and are instead logged after-the-fact by the Human Resources team after a review of Targets' electronic records.[35] Once the change is logged, Target Human Resources employees and/or Target management may attempt to obtain initials from the Team Members in the "TM Acknowledgement of Voluntary Change" column, often never obtaining initials or not obtaining the signatures until the end of the month, well after

---

where change is "voluntary," demonstrating "voluntary" is understood as employee-initiated); Exhibit 5, Gladman 56:14-19 (testifying that the "Acknowledgement" column represents that a chance "*has been made*") (emphasis added).

[32]     Exhibit 8, Brotnitsky Tr. 43:22-47:4 (identifying requirements of the Fair Workweek Law but *not* the requirement to obtain consent for additional hours or that Team Members may decline additional hours); Exhibit 6, Gonzalez Tr. 49:17-53:1 (same), 53:8-12 ("The Schedule Edit Log is basically just a log to show if there was an edit to someone's schedule.").

[33]     Exhibit 8, Brotnitsky Tr. 73:13-75:8 (testifying that the discussion regarding schedule changes between Team Member and Team Lead (manager) "prior" to the change being recorded in the Schedule Edit Log); 125:12-127:4 (Team Members' managers "verbally" inform Team Members of additional hours and "[a]fter the Team Lead talked to their Team Member, then the Team Lead would come and let me know or they would write it in the Schedule Edit Log thsmelves.").

[34]     Exhibit 8, Brotnitsky Tr. 73:13-75:8 (testifying that the *Team Leader* records or asks human resources to record schedule changes in the Schedule Edit Log *after* having the discussion with the Team Member); Exhibit 5, Gladman Tr. 48:10-15 (testifying that Schedule Edit Logs maintained by human resources).

[35]     Exhibit 5, Gladman Tr. 32:9-19 (explaining that once HR reviews the electronic MyTime, then they add any changes to the edit log).

the additional hours were worked.[36]  This process exemplifies that the Logs do not memorialize written consent from employees before Target adds time to their schedules.

Consistently, common evidence demonstrates that the Logs are maintained in the possession of the HR team and are utilized as an HR tool for recording scheduling changes – *not* for obtaining contemporaneous written consent from employees before working additional hours.

Here, whether Target obtained and documented written consent from Team Members for additional work will be determined based on uniform evidence, including: (1) the uniform lack of a policy regarding obtaining written consent when adding time to employees' schedules; (2) the uniform lack of documentation memorializing such written consent, such as the template provided by the City of Philadelphia, *see* Exhibit 12; (3) the uniform failure of the Schedule Edit Logs to constitute written consent; and (4) the testimony of Target's witnesses that confirm Target's failure to obtain written consent as required by the Fair Workweek Law. As such, this claim is well suited for class-wide adjudication.

---

[36]    Testimony revealed that signatures (when they are even obtained) are obtained after the fact.  Exhibit 5, Gladman Tr. 51:16-52:9 (Human Resources Business Partner explaining that as part of bimonthly Fair Workweek audit, if there are missing signatures she asks HR to go back with those team members and get signatures), 56:14-19 (explaining that the "TM acknowledgement of voluntary change TM initial" column "is where the team member would put their signature -- I'm sorry, their initials essentially agreeing to the change that *has been made*") (emphasis added); Exhibit 8, Brotnitsky Tr. 69:7-70:13 (HR Expert explaining that schedule change recorded in the Log the day after the change); Brotnitsky Tr. 73:13-75:9 (Team Leader fills out schedule edit log after talking about Team Member staying late); 76:14-83:15 (describing trying to obtain signatures by the end of the month);  Exhibit 6, Gonzalez Tr. 76:23-77:08 ("TM Acknowledgement of Voluntary Change TM Initial" means "if, like, let's say, uhm, we're adding more hours to their shift or if there -- they came in late, it was to be acknowledged -- for the Team Members to acknowledge that they *worked* a different shift from their originally-scheduled shift") (emphasis added), 77:09-79:06 (describing obtaining signatures from Team Members by the end of the month), 83:9-18 (describing HR team making sure signatures are on Schedule Edit Logs by the end of the month).

**b. Additionally, Whether On Their Face, The "Philadelphia Schedule Edit Logs" Fail To Constitute Written "Consent" From Employees Can Be Adjudicated Base On Common Evidence.**

At the merits phase, Plaintiff can also show that the Philadelphia Schedule Edit Logs do not memorialize employees' written consent to additional hours, relying on common evidence – the Schedule Edit Logs themselves.

Importantly, in numerous instances, the Logs themselves contain no employee signatures or initials *whatsoever* in instances where time is added to employees' schedules, *see, e.g.,* Exhibits 10 and 11 (examples of Schedule Edit Logs). [37] This undermines any argument by Target that the Logs record employees' written consent to additional hours, as in such instances, there is no written communication whatsoever from employees. Thus, even assuming that employee signatures or initials would render the Logs compliant with the Fair Workweek Law's consent requirements (which they do not), the absence of signature or initials in numerous instances demonstrates on their face Target's failure to obtain consent, in violation of the Fair Workweek Law.

Moreover, even where the Logs record employees' initials in the spaces for employees to initial that they "acknowledge[]" schedule changes, *see* Exhibits 10 and 11 ("TM *Acknowledgement* of Voluntary Change") (emphasis added), the Logs do not record that an employee actually *consented* to the additional hours prior to working those additional hours, *see id.* The word "consent" does not appear anywhere on either version of Target's Philadelphia Schedule Edit Logs. *See* Exhibits 10 and 11. Plaintiff will make the common legal argument that an employee's "acknowledgment" that a change has been made does not constitute

---

[37]    *See* Exhibit 5, Gladman Tr. 51:16-53:21 (acknowledging Philadelphia Schedule Edit Logs do not always contain Team Member initials in the "acknowledgment" column); *see also* Exhibits 10 and 11 (examples of Schedule Edit Logs).

contemporaneous "consent" contemplated by the Fair Workweek Law. The Fair Workweek Law requires that employees have an opportunity to decline the additional hours, § 9-4602(6). An "acknowledgment" of changed schedule does not record that the employee had an opportunity to decline the additional work before the work was performed.

Indeed, neither version of the Logs record the date that employees "acknowledge" the schedule change, Exhibits 10 and 11. The Logs therefore do not memorialize that employees provided written consent to schedule changes *prior to* the change occurring – but this is the very essence of providing such consent. As described above, Target's practices have not and do not ensure that employees provide "acknowledgement" (let alone "consent") *prior to* the schedule change. In contrast to the City of Philadelphia's template described above and attached as Exhibit 12, neither version of Target's "Philadelphia Schedule Edit Log" record a "Date of Consent" (or even a date of "acknowledgement") nor do they record the date(s) the forms were signed by the employee and supervisor. *Compare* Exhibit 12 *with* Exhibits 10 and 11. Instead, as explained, Target's Philadelphia Schedule Edit Logs just provide a space to capture employee initials, with no indication of when the initials were obtained (*i.e.* before the additional hours were worked or after) or whether the initials reflect actual employee consent to additional hours.

In sum, Plaintiff can point to common evidence and common legal arguments regarding the meaning of "consent" under the Fair Workweek Law when seeking to show that as a matter of law common to all class members, Target does not obtain and document employees' "consent" to work additional hours, in violation of the Fair Workweek Law.

### E.  Proposed Class Members' Damages Are Measurable

As discussed below, while determining damages is *not* an endeavor to be undertaken at the class certification stage nor is it certification defeating, Plaintiff notes that the damages in this case

easily measured. Indeed, the Fair Workweek Law sets forth "presumed damages" that are premised on the number of pay periods in which a violation occurs or continues, and the violations have an assigned value per impacted employee per pay period, *see* Phila. Fair Workweek Reg. 10.0.

## III. THE COURT SHOULD GRANT CLASS CERTIFICATION

The class should be certified pursuant to Federal Rule of Civil Procedure 23(b)(3) because each requirement described in Rule 23(a) and 23(b)(3) is satisfied. As noted above, numerous courts have granted class certification to settlement classes (and likewise granted final settlement approval) in cases involving Fair Workweek Law violations. Here too, the class should be certified.

### A. Class Certification Under Rule 23(b)(3) Is Warranted

Plaintiffs first must meet the four requirements of Rule 23(a) and the additional requirements described in Rule 23(b)(3). Rule 23(a) is satisfied if:

> (1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy].

Fed. R. Civ. P. 23(a). Rule 23(b)(3) further requires that "questions of law or fact common to class members predominate over any questions affecting only individual members [predominance]," and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy [superiority]." Fed. R. Civ. P. 23(b)(3). Though a court's class certification analysis is "rigorous," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), the Supreme Court has made clear that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent — but only to

24

the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *accord, e.g., Jani-King*, 837 F.3d at 322 (affirming Surrick, J. and explaining that "the class certification stage is not the place for a decision on the merits").

### 1.    Numerosity

Numerosity exists where the proposed class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23 (a)(1). While the Third Circuit has not set a specific numerosity threshold, generally, numerosity is satisfied in this circuit if the number of class members exceeds 40. *See, e.g., Boley v. Universal Health Servs., Inc.*, 337 F.R.D. 626, 631 (E.D. Pa. 2021), *aff'd*, 36 F.4th 124 (3d Cir. 2022). Here, in removing this case to this Court, Target represented that, at the time of removal, the proposed class consisted of over 4,000 Team Members. ECF No. 1 at p. 4. Target cannot dispute that numerosity is satisfied.

### 2.    Commonality

Commonality exists where there are "questions of law or fact common to the class." Fed. R. Civ. P. 23 (a)(2). The commonality requirement "is easily met," *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). As the Third Circuit has observed:

> Meeting this requirement is easy enough: "[W]e have acknowledged commonality to be present even when not all members of the plaintiff class suffered an actual injury, when class members did not have identical claims, and, most dramatically, when some members' claims were arguably not even viable."

*In re. NFL Players Concussion Injury Litig.*, 821 F.3d 410, 427 (3d Cir. 2016) (quoting *In re Community Bank of N. Va Mortg. Lending Practices Litig.*, 795 F.3d 380, 397 (3d Cir. 2015)). Commonality "requires that class members share at least one question of fact or law in common with each other." *Davis v. Target Corp.*, No. CV 23-89, 2023 WL 8373162, at *3 (E.D. Pa. Dec.

1, 2023).  And "[t]he question ought to be one capable of class-wide resolution and tending to 'generate common *answers* apt to drive the resolution of the litigation.'" *Id.* (quoting *Dukes*, 564 U.S. at 350).

Commonality is met here.  The proposed class members share several common questions that will drive resolution of Target's liability in this case.  Those questions include:  (1) whether Target's failure to distribute to Team Members and to post in the workplace a written policy for offering and distributing work shifts violates the Fair Workweek Law; (2) whether Target's uniform Notices of Available work are compliant, (3) whether Target's failure to provide the Notices of Available Work electronically violates the Fair Workweek Law; and (4) whether Target's common failure to obtain and document written contemporaneous "consent" to added work shifts violates the Fair Workweek Law (which will be resolved based Target's common lack of a policy, common testimony, and Target's common documents).

Certification is particularly appropriate where, like here, the key legal issues can be resolved by an evaluation of common policies, *see, e.g., Jani-King*, 837 F.3d at 322 (affirming Judge Surrick's certification in alleged misclassification case, finding that the "franchise agreement, policies manual, and training manual are common to the class" and "describe the level of Jani–King's right to control its franchisees" and finding certification appropriate because this common evidence can be used to resolve the claim).  *See also, e.g., Williams v. Sweet Home Healthcare, LLC*, 325 F.R.D. 113, 125 (E.D. Pa. 2018) (commonality and predominance satisfied where, *inter alia*, employer's "written policies and testimony regarding its adherence or lack thereof to those policies" predominated over individual factual issues); *Talarico v. Pub. P'ships, LLC*, No. CV 17-2165, 2022 WL 1524109, at *8  (E.D. Pa. May 12, 2022) (finding commonality and predominance where "materials, policies and practices apply uniformly to all proposed class

members and are common evidence of the claim that [defendant] is a joint employer").

Here, the Fair Workweek Law operates akin to a strict liability statute and Target has implemented (or failed to implement) common policies and Fair Workweek Law documents, discussed at length above. The sole focus of this case is whether those policies and documents (or absence thereof) are compliant with the Fair Workweek Law. As noted, this case presents straightforward questions that are common to all class members, and the answers to these shared questions will drive resolution of Target's liability under the Fair Workweek Law. Commonality is satisfied.

### 3.   Typicality

"Typicality" is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). Per the Third Circuit:

> The requirement of typicality is imposed to prevent certification when "the legal theories of the named plaintiffs potentially conflict with those of the [class] absentees." To avoid conflict, typicality seeks to ensure "the interests of the class and the class representatives are aligned 'so that the latter will work to benefit the entire class through the pursuit of their own goals.'" In evaluating typicality, we focus on whether the class representatives' legal theory and claim, or the individual circumstances on which those theories and claims are based, are different from those of the class.

*Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 133 (3d Cir. 2022) (internal citations omitted). "This is a low threshold." *Davis v. Target*, 2023 WL 8373162 at *3 (internal citation and quotation marks omitted). "[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Baby Neal*, 43 F.3d at 57.

The typicality requirement is easily satisfied. Plaintiff's legal theory is entirely aligned with the interests of other Proposed Class Members, as they share the same legal theory of Target's common non-compliance with the Fair Workweek Law, as discussed throughout.

### 4.    Adequacy

Rule 23 (a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23 (a)(4). "For adequacy, we look to see if the 'named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class.'" *Davis,* 2023 WL 8373162, at *3 (quoting *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988)).  Here, there is no potential conflict between the Plaintiff and the Proposed Class Members. All are asserting the same claims.  Plaintiff has actively participated in this case, as he has sat for deposition and made himself available to counsel to assist in the investigation and prosecution of this case.  And class counsel are knowledgeable and have substantial experience litigating Fair Workweek cases, and they have vigorously pursued this litigation for years.[38]

### 5.    Predominance

Rule 23's "predominance" requirement is satisfied when "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed R. Civ. P. 23(b)(3). This predominance inquiry asks "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotation and citation omitted).  Indeed, "[t]he predominance requirement tests whether the common issues in the case are more important than the individual issues." *Hargrove v. Sleepy's LLC*, No. 22-2040, 2023 WL 3943738, at *2 (3d Cir. June 12, 2023); *accord  Malone v. United States Parcel Service,*

---

[38]    *See* Declaration of Ryan Allen Hancock; Declaration of Sally Abrahamson; Declaration of Sarah Schalman-Bergen.

*Inc.*, No. 2:21-CV-03643-JDW, 2025 WL 3565108, at *13 (E.D. Pa. Dec. 12, 2025) (finding predominance where "Plaintiffs have demonstrated that the common issues in this case are far more important than the individual ones").

**a.**      **The Rules Underlying The Predominance Analysis**

The Supreme Court and Third Circuit have established four basic rules applicable to any predominance analysis. These rules are summarized below:

*First*, predominance does not require a finding that every issue in a lawsuit be resolved through common evidence. As the Supreme Court has explained:

> When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

*Tyson Foods*, 577 U.S. at 453 (emphasis supplied; internal quotation and citation omitted). Indeed, "Rule 23(b)(3) … does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to class-wide proof." *Amgen Inc. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 469 (2013) (cleaned up). *See also, e.g., In re Prudential Insurance Co. Sales Practice Litig.*, 148 F.3d 283, 315 (3d Cir. 1998) ("presence of individual questions does not *per se* rule out a finding of predominance"); *Rivet v. Off. Depot, Inc.*, 207 F. Supp. 3d 417, 431 (D.N.J. 2016) ("granular uniformity between class members is not required for establishing predominance").

*Second*, as reflected in the above passage from *Tyson Foods*, predominance is not defeated by arguments that determining class members' damages may require individualized inquiry. The

29

Supreme Court and Third Circuit have repeatedly endorsed this basic rule.[39] *Accord, e.g., Davis v. Target,* 2023 WL 8373162, at *5 (finding that just as in *Tyson Foods*, the "central question of whether the relevant time is categorically compensable predominates over individual differences in liability or damages") (Murphy, J.); *Sadler v. Target Corp.*, No. CV 23-00030, 2025 WL 337698, at *6 (D.N.J. Jan. 29, 2025), *reconsideration denied,* No. 1:23-CV-00030, 2025 WL 1158665 (D.N.J. Mar. 13, 2025) (rejecting Target's arguments regarding "multiple subsidiary questions" that "go to individual damages which does not preclude certification" and certifying class of Target warehouse workers in case for unpaid wages).

     **Third**, employers cannot defeat predominance based on purported "individualized" issues caused by its own failure to maintain adequate records.[40] Such a rule makes good sense:

> If we accept this argument and allow [the employees'] class action to be thwarted by [the employer's] lack of records, we would be creating an incentive for employers not to keep records and thus avoid potential lawsuits. We thus would be crafting a vast loophole to class certification.

*Hargrove v. Sleepy's LLC*, 974 F.3d at 483; *see also Hargrove II*, 2023 WL 3943738, at *2-3.

     **Fourth**, Rule 23(b)(3) does *not* require the plaintiffs to prove "that the predominating

---

[39]    *See, e.g.*, *Tyson*, 577 U.S. at 453 (predominance "even though other important matters will have to be tried separately, such as damages"); *In re Suboxone Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020) ("Although allocating the damages among class members may be necessary after judgment, such individual questions do not ordinarily preclude the use of the class action device.").

[40]    This rule is exemplified by the Supreme Court's seminal *Tyson Foods* opinion, where food processing employees alleged that time spent "donning and doffing" protective gear was compensable under the FLSA and Iowa wage law. The employer opposed class certification, arguing that "person-specific inquiries into individual work time predominate over the common questions raised by respondent's claims, making certification improper." *Tyson Foods*, 577 U.S. at 454. The Supreme Court rejected this argument, observing that any such complexities were caused by the employers' own failure to record the donning and doffing time and that employees should not be "punish[ed]" for the employer's lack of records. *See id.* at 456-57. As the Third Circuit has explained, *Tyson Foods* holds "that employees' wage claims should not suffer simply due to an employer's failure to maintain employee pay records that it is required to keep by law." *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 482 (3d Cir. 2020).

question will be answered in their favor." *Amgen*, 568 U.S. at 468.  Put differently, "the class certification stage is not the place for a decision on the merits." *Williams*, 837 F.3d at 322.

**b.      The Predominance Requirement Is Satisfied Here**

Target cannot dispute that the legality of its class-wide, common Fair Workweek Law policies and documents are the very subject of this lawsuit.  As described above, this case concerns (1) whether Target's admitted absence of a written policy for offering and distributing work shifts that is distributed to Team Members and posted in the workplace violates the Fair Workweek Law; (2) whether Target's uniform Notices of Available Work comply with the Fair Workweek Law and (3) whether Target's common, class-wide failure to distribute the Notices of Available Work electronically violates the Fair Workweek Law; and (4) whether Target's common failure to obtain and document written contemporaneous "consent" to added work shifts violates the Fair Workweek Law (which will be resolved based Target's common lack of a policy, common Testimony, and Target's common documents).  Every proposed class members' claims hinges on whether these standardized corporate policies, documents, and practices (or lack thereof) comply with the Fair Workweek Law.  The legality of these documents and policies are the overarching, predominating questions in this case, and Plaintiff can point to the common evidence of these documents and Target's policies regarding when seeking to prove Target's violations of the Law with respect to these items. *Cf., e.g., Goldman v. Radioshack Corp.*, No. 03 Civ. 0032, 2005 WL 1124172, at *4 (E.D. Pa. May 9, 2005) (finding predominance where the employer "is a large corporation with many standardized procedures governing the [employees'] position.").

These common legal questions in this case are straightforward: either Target complied with the Fair Workweek Law with respect to these common documents and policies, or it did not.  These questions – and the common evidence surrounding these questions – are central to this case.  In

31

the absence of class litigation, individual class members would have to litigate the legality of the exact same documents, policies, and practices over and over again, pointing to the same evidence and making the same legal arguments.  Predominance is satisfied in this case.  *See, e.g., Jani-King*, 837 F.3d at 322 (affirming Surrick, J. granting class certification and finding predominance in misclassification case, finding that "is enough for us to determine that some franchise agreements may contain sufficient controls to render the relationship one of employment and that the common documents in this case contain the types of evidence that courts and juries use to make that determination under Pennsylvania law").

### 6.    Superiority

Rule 23's "superiority" requirement is satisfied upon a finding that class litigation is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The superiority assessment entails the consideration of four separate factors:

*First*, the Court must consider the class members' "interests in individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). This factor protects against class certification where individual class members have a strong interest in "individually controlling" the litigation because, for example, the individual claims are emotionally charged or involve significant damages amounts. *See* William B. Rubenstein, *Newberg & Rubenstein on Class Actions – 6th Ed.* at §4:69. This is not such a lawsuit.  While Proposed Class Members' potential *aggregate* damages are significant, the payments owed to any individual class member is not.  This is precisely the type of lawsuit Rule 23 is intended to facilitate.  *Second*, the Court considers "the extent and nature of any litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. Rule 23(b)(3)(B). To counsel's knowledge, this is not an issue.

*Third*, the Court considers the desirability of "concentrating the litigation of the claims in

a particular forum." Fed. R. Civ. P. 23(b)(3)(C).  Here, all Proposed Class Members work or worked in this judicial district and the claims at issue concerns Philadelphia law.  The Defendant removed this matter to this court, and the case has been proceeding in this Court for years.[41] *Fourth*, the Court considers "likely difficulties in managing the class action." Fed. R. Civ. P. 23(b)(3)(D).  Here, no significant manageability issues exist, and judicial efficiency is served by proceeding as a class.  As described throughout, the proposed class members' claims turn on common questions regarding Target's common lack of compliance with several aspects of the Fair Workweek Law, rendering class management of thousands of individuals highly favorable to individual trials. *See, e.g., Sadler,* 2025 WL 337698, at *4.

### 7. Ascertainability

In addition to the Rule 23 factors, courts have applied the ascertainability doctrine, which ensures that "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  *Hargrove*, 974 F.3d at 469–70 (internal quotation marks and citations omitted).  This standard is not exacting: "a plaintiff need not be able to identify all class members at class certification—instead, a plaintiff need only show that class members can be identified." *Id.* at 477 (citation and quotation marks omitted).  The Proposed Class is comprised of Target's hourly Team Member employees in Philadelphia, who are identifiable in Target's records and who Target has already identified, *see, e.g.,* ECF No. 1 (Notice of Removal).

---

[41]    *See, e.g., Portillo v. Nat'l Freight, Inc.*, 336 F.R.D. 85, 96 (D.N.J. 2020) (finding superiority "especially considering that it has already been concentrated here for nearly five years").

### B.    Plaintiff's Counsel Should Be Appointed As Class Counsel

Rule 23 provides that "a court that certifies a class must appoint class counsel," Fed. R. Civ. P. 23(g)(1), and lists four factors that must be considered, *see id.* at 23(g)(1)(A)(i)-(ii).[42]  each factor is satisfied.  Plaintiffs' Counsel are experienced employment rights lawyers with substantial experience litigating class and collective actions arising under federal, state, and city laws, including the Fair Workweek Law. And Counsel have completed extensive discovery and worked diligently on this litigation. *See* Declaration of Ryan Allen Hancock; Declaration of Sally Abrahamson; Declaration of Sarah Schalman-Bergen.

### C.    The Court Should Approve The Enclosed Form Of Notice And Notice Protocol

Courts certifying a class action must "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  Plaintiff attaches a Proposed Notice and Notice Protocol at Exhibits 17 and 18, which both satisfy Fed. R. Civ. P. 23(c)(2)(B).

## IV.    CONCLUSION

For the reasons set forth herein, the Court should grant class certification.

---

[42]    Factors (i) and (iv) require the Court to consider "the work counsel has done in identifying or investigating potential claims in the action" and "the resources that counsel will commit to representing the class."  Meanwhile, factors (ii) and (iii) require the Court to consider "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action" and "counsel's knowledge of the applicable law."

December 19, 2025

Respectfully submitted,

By: */s/ Ryan Allen Hancock*

Ryan Allen Hancock
(Pa Bar No. 92590)
Willig, Williams & Davidson
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103
Tel.: 215.656.3679
rhancock@wwdlaw.com

Sally J. Abrahamson
(admitted *pro hac vice*)
WERMAN SALAS P.C.
335 18th Pl NE
Washington, D.C. 20002
(202) 830-2016
sabrahamson@flsalaw.com

Sarah R. Schalman-Bergen
(Pa Bar No. 206211)
Krysten Connon
(Pa Bar No. 314190)
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116
Tel.: 617.994.5800
ssb@llrlaw.com
kconnon@llrlaw.com
*Attorneys for Plaintiff and the
Proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing has been filed on the ECF docket and is available for viewing and download on this 19th day of December, 2025.

Respectfully submitted,

By: */s/ Ryan Allen Hancock*

Ryan Allen Hancock
(Pa Bar No. 92590)
Willig, Williams & Davidson
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103
Tel.: 215.656.3679
rhancock@wwdlaw.com

36